**CONTINENTAL BAKING COMPANY, Appellant,**

v.

**The OLD HOMESTEAD BREAD COMPANY and Interstate Brands Corporation, Appellees.**

**No. 71–1679.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 18, 1972.

Decided March 22, 1973.

Rehearing Denied May 7, 1973.

See also, D.C., 47 F.R.D. 560.

John H. Schafer, of Covington & Burling, Washington, D. C. (Miles C. Cortez, Jr., of Welborn, Dufford, Cook, Phipps & Brown, Denver, Colo., Gordon A. Thomas, Rye, N. Y., and George R. Poehler and Charles Lister, of Covington & Burling, Washington, D. C., of counsel, with him on the brief), for appellant.

John S. Pfeiffer, Denver, Colo. (Gorsuch, Kirgis, Campbell, Walker & Grover, Frederic L. Kirgis, Robert E. Warren, Jr., and Alan G. Clausen, Denver, Colo., with him on the brief), for appellee, The Old Homestead Bread Co.

Edward L. Foote, Chicago, Ill. (Benjamin F. Stapleton, and Kenneth L. Starr, Denver, Colo., Edward J. Wendrow, and Brian A. Loftus, Chicago, Ill., Ireland, Stapleton, Pryor & Holmes, Denver, Colo., and Winston & Strawn, Chicago, Ill., of counsel, with him on the brief), for appellee, Interstate Brands Corp.

Before SETH and HOLLOWAY, Circuit Judges, and LANGLEY, District Judge.

SETH, Circuit Judge (By reassignment from HOLLOWAY, Circuit Judge).

Appellee, The Old Homestead Bread Company, commenced this suit under the Sherman Act and the Robinson-Patman Act against the appellant, Continental Baking Company, Rainbo Bread Company, and Interstate Brands Corporation. Interstate crossclaimed against Continental, and Continental counterclaimed

against Interstate. The action was tried to a jury which returned a verdict for The Old Homestead Bread Company against Continental in the amount of $1,048,500.00, with attorney fees of $290,000.00; and for Interstate Brands Corporation against Continental in the amount of $130,000.00 and $70,000.00 as attorney fees.

Continental has taken this appeal, asserting several errors were committed by the trial court, and that there was not substantial evidence to support the verdict of the jury.

Continental's defense to the suit was generally that it was engaged in private label merchandising of its bread and the asserted price discrimination was in accordance with its use of the private label, "Tender Crust." It also advanced the defenses of pricing to meet competition in good faith, and of cost justification.

The initial causes of action of the plaintiff-appellee Old Homestead were based on section 2 of the Sherman Act [15 U.S.C. § 2], and on the Robinson-Patman Act [15 U.S.C. § 13(a)]. Interstate's cross claim asserted the same causes of action. All the parties were engaged in the baking business and were selling bread and other bakery products at wholesale to independent grocery stores. The bakeries concerned were in Denver, Colorado.

■■ About two weeks before trial, Old Homestead filed an additional pretrial statement or proposed pretrial order which included reference to some additional facts not theretofore advanced, and based thereon, asserted these facts showed a violation of section 1 of the Sherman Act. A hearing was held as to this new evidence as Continental asserted that a continuance was necessary so it could conduct further discovery. The trial court denied the continuance, and ruled that this evidence, which related to the connection between Continental and Five States Supply Company, was within the scope of prior pretrial orders and issues and that Continental had access to

the information. We find no abuse of discretion by the trial court in this ruling.

■ There was also an objection by Continental to the joining of the several claims against it, and also an objection to both plaintiffs proceeding against it at the same time. The motion was denied and properly so. There was an ordering of the proof. The trial was somewhat complicated by the several claims, and cross claims of the several parties, but not unduly so. The trial court's action in this respect was well within its discretion. See Continental Baking Co. v. Utah Pie Co., 396 F.2d 161 (10th Cir.).

In Denver and southeastern Wyoming, before the complaint period (July 1964 through 1967), there were four principal wholesale bakeries supplying bread to the independent grocery stores. These were the appellant-defendant, Continental Baking Company, another defendant, Rainbo, which did not appeal, Old Homestead, and Interstate Brands. The retail chain stores baked bread for their own stores and not for others. Each of the four original parties to this suit operated large modern bakeries in Denver. In 1962 Continental built a new bakery in Denver with a very large capacity; at the time it was completed its share of the market served by the non-chain bakers could be supplied with its new plant operating at about fifty per cent of capacity. The plant could not be operated profitably at fifty per cent of capacity.

Each of the parties was able to increase its sales through the year 1963, but the volume was produced at an increased unit cost. By 1964 each baker was losing money, but in July 1964 the wholesale prices for bread increased about ten per cent which was enough for each to operate profitably.

Before 1964 each bakery served its independent grocery store customers with routemen who were responsible for deliveries, placing the bread in racks at the store, and for the placement of the product in an advantageous place in the

store. The record shows that the white pan bread produced by the four bakers before and after 1964 was of like kind and quality.

By far the greater number of independent grocery stores in the Denver-southeast Wyoming area during the complaint period were members of Associated Grocers (AG). This was a cooperative to purchase goods in quantity for its members. Before 1964 the members of AG bought bread from the different independent bakeries in the area. In the summer of 1964 a separate company was organized called "Five States Supply Company" to provide bread to AG members who wanted to join the new company. Five States had no separate offices or facilities, but operated through AG. For an AG member to also become a member of Five States, a fee of one hundred dollars was required, as was an agreement to comply with its bylaws. The bread to be supplied to its members by Five States was to be labeled "Tender Crust." One of the bylaws of Five States was that the retail grocer member would keep the price of Tender Crust ". . . so that it will always be offered at the same price of any other bakery products of same quality, weight or size."

In July 1964 Continental entered into a written agreement with Five States whereby it agreed to furnish the private label "Tender Crust" bread and other bakery products. Under this agreement Continental was to also have "preferred space" on the store racks for its regularly advertised brands.

The agreement between Continental and Five States also provided that the private label price, that is the Tender Crust price, to the retail grocery store member of Five States would be at least one cent per loaf less for Tender Crust than for Continental's advertised products (Wonder Bread). It also provided that the wholesale price of advertised labels of Continental would be maintained at the wholesale prices of Continental's competition. The competition was, of course, Rainbo, Old Homestead, and Interstate. The result of the agreement thus was that the Five States grocers, since they had agreed to charge at retail the same price for each product of like kind or quality, always made at least one cent more per loaf on the Tender Crust bread than on other labels they sold. This agreement was referred to as the "Tender Crust program." There were some later changes by practice to include discounts of various kinds, but the basic agreement remained in effect during the complaint period.

Before the advent of the Tender Crust program there had been no private label bread sold in the area by the parties to the suit. After the program began there were several private labels and secondary labels marketed. The wholesale prices of bread also began to drop rapidly as did the volume sold by the plaintiffs.

Several officials of Continental attended board meetings of Five States from time to time and Continental assisted in preparing and circulating the newsletter of Five States. These newsletters in 1964 and 1965 urged more AG members to join Five States, and to so participate in the Tender Crust program. There were about 112 member stores in Five States by early 1965, 167 in February 1967, and 200 in January 1968. This was out of a total of 415 AG stores on the later date.

The record shows that Continental in its Denver plants sold in 1963 about 27,700,000 pounds of bread products and lost money there in 1963, 1964, 1965, and 1966. In 1967 the operations of Continental at Denver showed a modest profit of $14,000.00, while nationally its profits were about twenty-one million dollars. In 1967 Continental had increased its sales in the Denver area to over 40,000,000 pounds of bread products. During the forty month complaint period the volume of sales by Old Homestead fell sharply, until, finally, on December 31, 1967, Old Homestead dropped out of the industry.

■ In this opinion we only give consideration to the Robinson-Patman aspect of the litigation. This case thus involves primary-line competition since Old Homestead and Interstate were in competition with Continental, the party charging the allegedly discriminatory prices. It is clear that primary-line injury is protected by the Robinson-Patman Act. FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385. For convenience, Interstate will be referred to as a "plaintiff."

The basic provisions of section 2(a) of the Clayton Act as amended by the Robinson-Patman Act are as follows:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . ."

To establish a claim under this Act, plaintiffs must have demonstrated price discrimination as defined by the statute, and that the effect resulting from the discrimination "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. . . ."

■ The term "price discrimination" means no more than price differentiation, or the charging of different prices to different customers for goods of like grade and quality. FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S. Ct. 1267, 4 L.Ed.2d 1385. It is undis-puted that Continental charged one price per load for its product labeled "Wonder Bread" and a different price for its product labeled "Tender Crust Bread." It is also uncontroverted that both of these brands were of like grade and quality. Since the goods are of like grade and quality, the fact that they are sold under different labels will not justify what would otherwise be price discrimination under section 2(a). FTC v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966). Therefore, the price discrimination element of this action is established by uncontroverted facts.

■ Price discrimination is, of course, not illegal per se. Plaintiffs, as indicated above, must have shown that the effect of the price discrimination "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination . . . ." The courts and the FTC have established several methods of proof directed to this injury to competition requirement.

*Growth Tending to Monopoly:*

■ By the language of the statute itself, price discrimination is unlawful if it may "tend to create a monopoly in any line of commerce." If plaintiffs here can show that this price discrimination had a tendency to create a monopoly in their "line of commerce," then this injury to competition requirement has been satisfied. Gold Strike Stamp Co. v. Christensen, 436 F.2d 791 (10th Cir.). There is some dispute in this case as to what should be considered the appropriate "line of commerce" or "relevant market." Continental argues that the relevant market includes not only the independent wholesale bakers but also the bakeries of the chain grocery stores such as Safeway. Adopting this construction, Continental's market share growth during the period of 1964–1967 was roughly from twenty per cent to

twenty-nine per cent of the market. The plaintiffs, on the other hand, contend that the relevant market is that of the independent wholesale bakers only. This construction is more realistic because the customers of the independent bakers, namely the independent retail grocers, could only buy bread from the independent bakers and not from the chain bakers. Therefore, the independent bakers did not compete, directly at least, with the chain bakers and so these should be considered two different "lines of commerce." Adopting this construction, during the four-year period 1964–1967, inclusive, Continental's market share went from about thirty-five per cent to fifty-one per cent. Also, the number of competitors went from four to three when Old Homestead dropped out.

Under the monopoly cases (Sherman Act § 2), it is fairly clear that a market share of fifty-one per cent would not constitute monopoly power. See, e. g., United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir.), where, in dictum, it is stated that sixty per cent would not constitute monopoly power. However, the question here is whether a four-year growth from thirty-five per cent to fifty-one per cent is growth *tending to create* a monopoly.

*Predatory Intent:*

■ Although the statute does not speak of "predatory intent," the courts have reasoned that, from a finding of predatory intent, the jury can infer that a reasonable possibility of competitive injury exists. Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, n. 12 at 696, 87 S.Ct. 1236, 18 L.Ed.2d 406, and cases cited therein; Cornwell Quality Tools Co. v. C. T. S. Co., 446 F.2d 825 (9th Cir.). On the standard of "reasonable possibility," see Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir.).

■ Since the "sum total of all the evidence must be considered" to find predatory intent, there is no set formula for such a finding. In the Utah Pie case, 386 U.S. 685, 87 S.Ct. 1326, 18 L. Ed.2d 406, the Court stated that predatory intent could be found· from "persistent unprofitable sales below cost and radical price cuts themselves discriminatory." There is some evidence in the case before us of sales below cost during a very short period, and discriminatory price cuts represented by discounts to Tender Crust customers only. Again in Utah Pie, the Court stated that the Act "comes into play to regulate the conduct of price discriminators when their discriminatory prices consistently undercut other competitors," and considered this conduct to be highly indicative of predatory intent. See Unlawful Primary Line Price Discriminations: Predatory Intent and Competitive Injury, Columbia L.Rev. 68:137 (1968).

■ There are several significant but isolated facts in the case before us which could support a finding of predatory intent. For example, in 1962, Continental built a bakery which was the largest in the Rocky Mountain Area but which at its opening operated at thirty-three million pounds, or fifty per cent of its capacity. The vice-president testified that he knew that it could not be operated profitably until it reached seventy-five per cent capacity, or fifty-two million pounds. From 1963 to 1967, Continental increased its production by fifty per cent or from thirty-three million pounds to fifty-two million pounds and at the end of the period was for the first time in the black. The seemingly impossible goal Continental set for itself in 1963 and, in view of the existing suppliers, the achievement of that goal would indicate that Continental's operations were based on something more than "fierce competitive instincts." The record also shows that the plaintiff Old Homestead ceased to do business on December 31, 1967, and on January 2, 1968, Continental raised its prices and did away with all discounts. There are other examples in the record which, when considered with those mentioned, could provide the jury with sufficient evidence from which to draw a strong

inference of predatory intent on Continental's part. Compare the cumulation of such facts in National Dairy Products Corp. v. FTC, 412 F.2d 605 (7th Cir.)..

*Causal Connection:*

The record clearly shows that both plaintiffs suffered some injury during the complaint period. The amount of those damages is in dispute and will be discussed below. Continental offers a variety of explanations as to why plaintiffs suffered these injuries. However, taking the record as a whole, the jury could easily infer that Continental's price discrimination incorporated in the Tender Crust program was the proximate cause of the price declines and of fluctuations during the period which resulted in lost profits and in a decline in sales actually made by appellees with a diversion of business from appellees to appellant.

A good discussion of the jury's latitude in assessing this causation factor in a case such as this can be found in this court's opinion in Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir.). Having there found that the defendants had conspired and attempted to monopolize the vanadium ore market, the court considered the question of whether or not these violations were causally related to the injuries suffered by the plaintiffs as follows:

"In our view of the evidence, the jury might very well have concluded that the failure of the venture was due to underfinancing, mismanagement or uneconomical operation, all factors over which neither the appellants nor either of them exercised any conscious control.

.   .   .   .   .   .

"But even so, it is fairly inferable that more forces were at work to bring about the downfall of the Nisley-Wilson enterprise than the mere forces of nature or the inexorable laws of economics. In determining whether a jury finding of actionable damages is justified by the record, we must consider the plight of the enterprise in the environment of an established conspiracy to monopolize or attempt to do so  .  .  .  Viewed in this setting, we cannot say that the jury's finding of attributable harm is unsupported in the record."

In the instant case, the jury was carefully, repeatedly, and specifically instructed that no award against Continental was justified unless the damages claimed by appellees were caused by its price discrimination. As in the Union Carbide case, although the evidence on this point was conflicting, the question was properly submitted to and resolved by the jury.

An analysis of the exhibits covering the years 1963 and 1967 permits the following tabulation to be made:

| 1963 | Sales in Dollars | Pounds of Bread |
|---|---|---|
| Continental | 5,100,875 | 27,739,659 |
| Rainbo | 2,559,039 | 14,938,838 |
| Interstate | 2,314,000 | 12,850,000 |
| Old Homestead | 4,118,938 | 22,850,000 |
| Total | 14,092,852 | 78,378,497 |
| 1967 | | |
| Continental | 7,319,792 | 40,850,512 |
| Rainbo | 3,186,818 | 17,521,511 |
| Interstate | 2,879,000 | 16,000,000 |
| Old Homestead | 906,445 | 5,030,000 |
| Total | 14,292,055 | 79,402,023 |

In comparing the sales in dollars for the years 1963 and 1967, assuming that these four companies represent the total independent wholesale bread market, then Continental's sales represented $5,100,875.00 of the total $14,092,852.00 or 36.2 per cent of the dollar volume of sales in 1963. In 1967, Continental's sales represented $7,319,792.00 of approximately the same total volume or 51.2 per cent. Also, these figures show that Old Homestead's losses during these years were not redistributed evenly over the remainder of the market but the relatively greatest amount went to Continental.

Comparing the sales in pounds, Continental's sales volume in 1963 was 27,739,659 of a total market of 78,378,497 or 35.4 per cent. In 1967, Continental's sales volume was

40,850,512 of a total market of 79,402.-023 or 51.5 per cent.

The Supreme Court in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S. Ct. 1502, 8 L.Ed.2d 510, pointed out that Congress chose language which was virtually identical for defining the injury to competition requirement for all violations covered by the different sections of the Clayton Act. The Court suggested therefore that if the anticompetitive effects of one violation are found to be proscribed by this language, then similar effects also result from a violation of another section.

The record contains substantial evidence of the injury to competition to support the finding of the jury.

*Private Label and Consumer Preference:*

The defendant urges that this case represents no more than the proper use and function of private label merchandising, and plaintiffs' attack is on this established sales method.

"Consumer preference," as we understand the term, is the difference in price between the same product (or essentially the same) sold under a private label and under an advertised label at the point where the two labels are considered an equally good buy by the consumer. This factor of consumer preference as explained and used by the Fifth Circuit in Borden Co. v. FTC, 381 F.2d 175 (5th Cir.), is that its inclusion is necessary in order to meet the problem or situation when private and advertised label goods are of like grade and quality, but should be treated differently under the Robinson-Patman Act. Thus, when the retail price margin between these two products accurately reflects the consumer preference, the prices while actually different are considered to be commercially equal.

The defendant argues that the consumer preference price difference is a result of marketing both private and advertised labels in the same market, and is proper. Thus it urges that the trial court should have instructed the jury to take the factor into consideration. However, there was no evidence in the record to support such an instruction, if it be a proper one, which we do not here decide. The record instead shows that the bylaws of the Five States organization established by defendant and Associated Grocers requires that the retail price of bread of all labels should be maintained at the same level. This would seem to eliminate any issue of consumer preference, and at the same time gives an extra profit margin to those able to buy the Tender Crust bread, that is, those in the "program." This consumer preference concept advanced by appellant was derived from the Supreme Court's opinion in FTC v. Borden Co., 383 U.S. 637, 86 S.Ct 1092, 16 L.Ed.2d 153. In that case, the Court rejected the contention that two products, though physically identical, should not be considered to be of "like grade and quality" for Robinson-Patman Act purposes if a definite consumer preference for one over the other has been created by advertising. The Court refused to "exempt the effective advertiser from the Act." The Court continued, "We think Congress intended to remit him to his defenses under the Act, including that of cost justification." Thus, consumer preference considerations, to the extent that they are to be recognized, are to be treated under the defenses to the Act and are not a part of the plaintiff's prima facie case under the statute. The burden of proof was on the defendant to justify what was otherwise a violation of the Act. Since no evidence was introduced on this issue, no instruction to the jury on this aspect of the defense was warranted. Therefore, we find no error in the trial court's refusal to give such an instruction.

The facts in this case and in Beatrice Foods Co., FTC Docket 8663 (1969), are quite similar and the Commission there stated:

"The record also reflects, what we know from numerous cases involving the dairy and retail food industries, that the grocery store atmosphere is

highly price sensitive. It [milk in Beatrice, and bread here] is one of the most important commodities carried in retail grocery stores. It has to be purchased frequently by the consumer because of its perishable nature. The record contains ample evidence that milk [in our case bread and cake products] is frequently used as a leader and advertised at special prices. . . .

"Furthermore, profit margins are notoriously low in the retail grocery business. The record shows that retailers take advantage of all available discounts and rebates in order to minimize cost and that differences in cost of a few pennies paid by the retailer for a major grocery item can have a substantial effect on gross and net profits."

The Commission also there quotes from Foremost Dairies, Inc. v. FTC, 348 F.2d 674 (5th Cir.), a case involving discounts on fluid milk to a chain of eight stores in Albuquerque, where that court said:

". . . It is unnecessary that there be evidence that the favored customer actually undersold his rivals; a substantial price advantage can afford a favored buyer a material capital advantage by enlarging his profit margin in a highly competitive field. . . ."

The jury could well have inferred that the built-in profit differential was the reason why the Five States organization was formed—that is to enable its members to buy the same product more cheaply than nonmembers and so have a wider profit margin. It was reasonable for the jury to have concluded that Continental was aware of this and that, if anything, they were encouraging it. Continental was aware that if retail prices stayed the same, the incentive to buy Tender Crust would always be present—that is, the grocer was always insured that his profit on Tender Crust would be more than his profit on any other label bread. Continental was thus

going to be able to secure and hold a large number of grocers. Also, because Wonder bread would always take second position in stores that bought Tender Crust, Continental was going to be able to better its position in many stores and increase its sales of Wonder, at the expense of all other wholesale bakers.

The defendant urges that the Tender Crust label was "available" to all the independent grocers and thus there was no discrimination. It would appear that the availability doctrine or defense is peculiarly inappropriate or inapplicable to a primary line case such as this, but in any event, there was an abundance of evidence showing the prerequisites to joining the program which made the label not "available" for these purposes. These requirements included a membership fee of $100.00, an agreement to give Tender Crust bread the best shelf space with the second best to Continental's advertised label, and to participate in the promotion of weekend specials. We find no basis to apply the availability doctrine.

*Defense of Good Faith Meeting of Competition:*

This well recognized defense to price cuts in circumstances such as are before us is strongly urged by the defendant Continental in this appeal.

In FTC v. Cement Institute, 333 U.S. 683 at page 725, 68 S.Ct. 793 at page 815, 92 L.Ed. 1010 (1948), the Court said:

"Section 2(b) permits a single company to sell one customer at a lower price than it sells to another if the price is 'made in good faith to meet an equally low price of a competitor.' But this does not mean that § 2(b) permits a seller to use a sales system which constantly results in his getting more money for like goods from some customers than he does from others."

Also in FTC v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338, the Court held that a prerequisite to asserting the meeting of competition

defense is that the party asserting the defense has established normal nondiscriminatory prices which he reduces to meet the equally low price of a competitor *when necessary*.

This court in Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir.), held that the good faith meeting of competition defense was a question of fact for the jury.

There is clearly enough evidence in the record before us from which the jury could have found against Continental on this defense. For example, John Barsch, sales manager of the wholesale division for Continental, testified as to how the contract with Five States was secured:

"A. But I knew that some baker was negotiating a contract with them.

"Q. But you didn't know anything about price, did you, sir?

"A. No, sir.

"Q. So my question is that the seventeen and a half cents that you offered to them had nothing whatsoever to do with any competitive move in the market, is that correct?

"A. That's correct."

As to a later price cut, Herbert Van Wyk, plant manager of Continental at Denver, testified:

"Q. This reflects that a six percent discount on all bread sales for the Tender Crust products, is this correct?

"A. That's right.

"Q. And that was in effect as of what date, sir?

"A. 9/26/66.

"Q. And to what period, sir?

"A. Indefinite.

"Q. And what brought that about?

"A. Rainbo Bread Company came out with their Buttermilk bread at the same price as Tender Crust at that time.

.    .    .    .    .    .

"Q. So what you're saying is that Rainbo came out with a Buttermilk loaf of bread and charged the same price therefore that you were charging Tender Crust, is that correct?

"A. That's right."

Thus the record shows that the initial negotiations and later price cuts were made without reference to what others in the market were pricing, and there was no "meeting" of competition. It should be noted that in Beatrice Foods, the record is replete with evidence of attempts by Beatrice to find out what the competitive bids were, of Beatrice offering one price and then lowering it because told that someone had already bid lower than that price, etc. Yet two members of the FTC, including the Chairman, did not think that this was sufficient. There is clearly an absence of evidence in the case before us from which the jury could have found that Continental initially or during the later price cuts and discounts was attempting in good faith to meet competition.

*Jury Instructions:*

The only specific instructions, the substance of which was not given, were the two relative to consumer preference. However, as indicated above, there was not enough evidence to warrant any instruction on this point being given, assuming the law permitted the giving of such instruction. The instructions as a whole were more than adequate to instruct the jury on the law relative to the case. They certainly covered all the legal theories involved, and as this court said in Walker v. Dean, 333 F.2d 753 (10th Cir.): "The record indicates that the jury was given . . . comprehensive instructions which adequately covered the issues involved in this case. . . ."

*Interstate Commerce:*

The appellant urges that there was no showing made by the plaintiffs as to interstate commerce to invoke the Robinson-Patman Act.

In Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203 (5th Cir.), the court said that since the decision in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 ". . . the critical language in the statute has been repeatedly construed to mean that the seller must not only be engaged in interstate commerce, but that one of the discriminatory sales must be in interstate commerce." See also Littlejohn v. Shell Oil Co., 456 F.2d 225 (5th Cir.); Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir.); and Borden Co. v. FTC, 339 F.2d 953 (7th Cir.).

The record at page 931 shows that Continental had sales in Casper, Sheridan, and Lander, Wyoming. A witness from Five States Supply testified that they had the "bread program" in Colorado and Wyoming. Continental estimated that it served 277 customers who buy Wonder bread in Wyoming, Kansas, and Nebraska from the Denver bakery.

We said in Food Basket, Inc. v. Albertson's, Inc., 383 F.2d 785 (10th Cir.), that:

"Since Meade Bread, the critical language of 2(a) has been repeatedly construed to mean that the seller must not only be engaged in interstate commerce, but that one of the discriminatory sales must be in commerce. (Citing cases).

"It seems safe to assume that if the post-Meade Bread case law is contrary to the language used there, the Supreme Court would have corrected the misinterpretation on repeated applications for certiorari. We take the statute to mean what it says, i. e., that at least one of the discriminatory sales complained of must be in commerce."

Thus as to interstate commerce, the officers of Five States Supply testified that they had the Tender Crust program in Wyoming; an officer of Continental estimated they had 277 customers of the Denver bakery in Wyoming, Kansas, and Nebraska. Thus it is clear that the interstate commerce requirement has been fully met.

*The Verdict:*

The jury returned a verdict on July 2, 1971, in favor of The Old Homestead Bread Company and against Continental Baking Company on each of Old Homestead's claims in the amount of $262,125.00. The foreman, responding to a question asked by the court at the request of plaintiff's attorney, stated that it was the intention of the jury that the amounts awarded on each of the four claims were to be added together to arrive at the total amount of damages that the jury had intended to award that plaintiff. Each juror was then asked separately if that was his or her intention, to which they all responded affirmatively. Thereupon the jury was asked to return on July 6, 1971, at which time the trial judge submitted a supplemental interrogatory to them as to Old Homestead, reading as follows:

"What did the jury find the damage to be to Old Homestead Bread Company as total damages in each and all of its claims against Continental Baking Company reflecting the total amount of loss suffered by Old Homestead Bread Company resulting from the conduct of Continental Baking Company?"

The jury answered that question this way:

"We the jury found that the total amount of damages suffered, that is, loss of profit, out of pocket loss and loss of going concern value arising from each and all claims was $1,048,500.00."

The original verdicts were then resubmitted to the jury which crossed out the amount of $262,125.00 and in its place inserted $1,048,500.00 on *each* of the separate verdicts.

Continental claims that since the jury was instructed that it could not cumulate damages, and in light of the "well recognized policy against impeachment of verdicts," this was error. Careful review of the instructions to the jury disclosed only the following language relative to cumulation of damages, given by

the trial judge at the beginning of the long, complicated instructions:

"As you know, it is not a single lawsuit. In the first place, the plaintiff has brought an action against Continental on three different theories, violation of the Sherman Act, Section 1, and Sherman Act, Section 2, and the Robinson-Patman Act. These are alternative approaches, though. First, you are not called upon to assess the amount of damage as to each one of them and then accumulate them, if you were to decide in their favor, there is no assurance they will be, because they all come out of the same nucleus of thought, and as I say are simply different legal theories and different remedies which are advocated to recover an award of damages.

"Consequently, I say this to you now and I think it ought to be kept in mind that they are entitled to a single recovery. In other words, if you were to, and I am not saying that you are apt to, decide in their favor on each of their alternative claims, still and all, there couldn't be any accumulation of it. It would simple [sic] be a recognition of the several claims that they have advocated."

In our opinion, these references as to how the jury was to record the amount of damages, if any, that they found on each of the separate verdicts, coupled with the length and complexity of the trial and the instructions, does not bar an interrogatory as to the true intent of the jury relative to an award of damages.

This court has said, in Young v. United States, 163 F.2d 187 (10th Cir.):

"The rule to which reference has been made excluding testimony or affidavits of jurors to impeach the verdict for misconduct of members of the jury occurring within the jury room and in connection with the deliberations of the jury does not prevent the reception of evidence of jurors to show that through mistake, the real

verdict on which agreement was reached in the jury room was not correctly expressed in the verdict returned into open court.

". . . But the jurors are competent witnesses for the purpose of showing that through oversight, inadvertence, or mistake respecting the substance of the verdict returned into court, is [sic] was not the verdict on which agreement was actually reached in the jury room. . . ."

See also Freid v. McGrath, 77 U.S.App. D.C. 385, 135 F.2d 833, where the distinction is made where there is a mistake not apparent on the face of the verdict as compared to attempts to impeach the verdict on various other grounds.

The reason and method used here were proper to correct the verdict first returned.

*Amount of Damages:*

*Old Homestead—*

■ As mentioned above, the jury awarded Old Homestead a total of $1,048,500.00 before trebling, of which $38,660.00 was attributed to going concern value of the business on the date of dissolution, December 31, 1967, after having been in business seventy years.

When, as a result of defendant's violations of the antitrust laws, a plaintiff's business ceases operation, an award for the "going concern value" on the date of cessation has been upheld. See Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F.2d 61 (1st Cir.). See also Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir.), where this court upheld allowing the jury to "consider as another element of damages the extent to which the value of appellee's profit or the net worth of its assets had been diminished as a result of the price discrimination."

■ In the instant case, the jury was instructed that it could award dam-

ages for going concern value and the court gave a brief but adequate explanation of what elements to consider in making an award. We have examined the record and in light of the facts, the award of $38,660.00 certainly is supported by substantial evidence.

Old Homestead's computation of its claim for lost profits is shown in Exhibit X–433. Basically it took its total sales volume for the complaint period, multiplied that by ten per cent (to account for the average drop in prices throughout the period) and subtracted six per cent of that figure for commissions which would have been due. The resulting figure is $1,059,501.00. The jury's award for lost profits was $1,009,840.00 ($1,048,500.00 minus $38,-660.00 for going concern value).

As Old Homestead states in its brief, its damage claim is predicated on the assumption that the ten per cent price increase of July 10, 1964 (July price), would have held but for Continental's violations. Defendant does not show that the July price was less than ten per cent higher than the average price through the period. Its attack centers on the causation question and on the assumption that the July price would have held but for the alleged violations. There was evidence before the jury to support the position of plaintiff as to the July price level and its being a reasonable price.

As to the validity of the assumption of the continuation of the July 1964 price, there is the evidence relating to defendant's actions on prices. The question of what the wholesale price would have been but for the introduction of the Tender Crust program is incapable of exact resolution. The interaction of the factors ensuing immediately at that point make the continuation at the assumed price a matter of inference. However, in cases such as this, the courts have repeatedly and consistently held the plaintiff to a lower standard of proof than he is normally required to meet.

"Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such a case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."

Story Parchment Co. v. Paterson Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544.

"The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."

Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652.

This position was recently reaffirmed by the Supreme Court in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). It has been otherwise stated: ". . . having thus established the factum of damages, the amount thereof may be fairly approximated by the jury." Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir.). Also:

". . . When wrongdoers, by their very actions, make it virtually impossible to prove damages precisely, they should not be heard to complain of the method of proof, if the method allowed by the trial court is reasonable under the facts and in the circumstances of the case."

North Texas Producers Ass'n v. Young, 308 F.2d 235, 245 (5th Cir.).

The next question, therefore, is whether or not the method of proof used by Old Homestead was reasonable under the circumstances of this case. In this regard, the case of Story Parchment Co.

v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, seems to be virtually dispositive of the question. That was a Sherman Act case alleging price-fixing and conspiracy to monopolize. In reviewing the damages issue, the Court reasoned as follows:

"There was evidence from which the jury reasonably could have found that . . . current prices, shown in detail, were higher during a period antedating the unlawful combination and price cutting in pursuance of it than afterward. It does not necessarily follow, of course, that these higher prices would have continued except for the conspiracy, but it is fair to say that the natural and probable effect of the combination and price cutting would be to destroy normal prices; and there was evidence of the prices received by petitioner before the cut prices were put into operation, and those received after, showing actual and substantial reductions, and evidence from which the probable amount of the loss could be approximated. The trial court fairly instructed the jury in substance that if they were satisfied that the old prices were *reasonable* and that they would not have changed by reason of any economic condition, but would have been maintained except for the unlawful acts of the respondents, the jury might consider as an element of damages the difference between the prices actually received and what would have been received but for the unlawful conspiracy." (Emphasis added).

The Court continued, stating the great latitude the jury had in such cases, and concluded by upholding the verdict.

The only possible point of departure in the instant case is that the July price was in effect for only a few weeks prior to the price war. Under some circumstances, this fact might be fatal to the plaintiffs' case. Here, however, plaintiffs took great pains to establish that the July price was a "reasonable price" and, therefore, would have held or gone higher.

The record shows that through the early 1960's, bread sales in the Denver area were up but costs were up even higher and prices had remained constant with the effect that profits were decreasing. By 1964, all competitors went in the red. From this evidence, plaintiffs argue and it can be inferred that the price increase of July 1964 was badly needed and was reasonable. This evidence lends support to the finding that the July price was "reasonable" and would have held. For another early Sherman Act case on point, see Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917). This court employed a similar method of computing damages in Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir.). There it appears the jury was allowed to determine what the reasonable price would have been throughout the complaint period and assess as damages the difference between the actual prevailing price and this hypothetical price. The Union Carbide case was cited by the Southern District of New York for the following proposition: "Reconstruction of a competitive price based on supply, demand, costs and other economic indicators is a logical and judicially recognized technique." Ohio Valley Electric Corp. v. General Electric Co., 244 F. Supp. 914 (S.D.N.Y.1965). In that non-jury case, the court described in detail how it arrived at the "competitive price" upon which to base its damage award. 244 F.Supp. at 946. Plaintiff was allowed to project the price reduction against the sales made through the period to compute its damages in American Cooperative Serum Ass'n v. Anchor Serum Co., 153 F.2d 907 (7th Cir.). See also Dean Foods Co. v. Albrecht Dairy Co., 396 F.2d 652 (8th Cir.).

Old Homestead's method of proof of damages was reasonable and proper under the circumstances. There was sufficient evidence from which the jury could reasonably infer that the result of Continental's violation was to depress prices by approximately ten per cent throughout the complaint period, and that,

therefore, the award to Old Homestead for lost profits was proper and based on substantial evidence.

*Interstate Brands—*

■ As mentioned above, the verdict awarded Interstate was $130,000.00 in damages, before trebling, presumably for lost profits on sales diverted from Interstate to Continental or at least on diverted sales caused by the Tender Crust program. One confusing aspect of the damage issue is that Old Homestead and Interstate used two completely different methods for computing lost profits. However, both methods appear to be reasonable and proper so this fact is of no real consequence.

Interstate's method was to introduce charts filled out by its routemen indicating the weekly sales made to each customer store before and after the Tender Crust program. These charts are in the record at X–934 through X–1045.

Interstate produced a witness, Mr. Nees, who testified basically that if sales had increased $1,000.00 per week, Interstate would have realized an extra $425.00 per week in profits. In other words, the profit percentage on an *additional* volume of sales per week was 42.5 per cent. His theory was based on incremental accounting. This testimony gives sufficient evidentiary support to the assumption that Interstate would have made at least twenty per cent profit on these sales which were diverted because of the impact of the Tender Crust program. This, together with an analysis of the routemen's charts, demonstrates that there was a basis for the jury verdict which is almost exactly the figures derived from the charts. There was thus substantial evidence to support the jury verdict in favor of Interstate.

There was indeed sufficient evidence before the jury upon which to base the verdicts, and we find no error in the various rulings by the trial court. The case is thus afffirmed.