James DAVISON, Plaintiff-Appellee,

v.

PACIFIC INLAND NAVIGATION COMPANY, INC., a Washington Corporation, Defendant-Appellee,

and

Mitsubishi International Corporation, a New York Corporation, Defendant-Appellant.

No. 75–3054.

United States Court of Appeals, Ninth Circuit.

Feb. 13, 1978.

Hardy Myers (argued), of Rives, Bonyhadi & Smith, Portland, Or., for defendant-appellant.

Raymond J. Conboy and Ridgway K. Foley, Jr. (argued), Portland, Or., for plaintiff-appellee.

Before BARNES and ELY, Circuit Judges, and VAN PELT, Senior District Judge.[*]

VAN PELT, Senior District Judge:

This case is an appeal from a judgment entered in the United States District Court of Oregon.

Plaintiff-appellee Davison, an employee of Jones-Oregon Stevedoring Co., (Jones-Oregon), received injuries on June 22, 1973, while working as a longshoreman unloading urea from Barge 312–1, owned by Pacific Inland Navigation Co. (PAC) and voyage chartered to Mitsubishi International Corporation (MIC). Davison sued PAC and MIC, alleging that their negligence was the cause of his injury. The jury returned a verdict of $32,212 for Davison against MIC and found in favor of PAC. MIC's Motion for Judgment Notwithstanding the Verdict or For a New Trial was denied by the trial judge.

The central issue on this appeal is whether MIC was negligent under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), as amended in 1972, 33 U.S.C. § 901 et seq.[1] We find no evidence to sustain the jury's award and reverse and

---

[*] The Honorable Robert Van Pelt, Senior Judge, District of Nebraska, sitting by designation.

[1] MIC's initial contention was that they owed no duty whatsoever to Davison. They based this on the fact that the barge was at all times in tow of a tug owned by PAC, that they never had possession of the barge, and this was only a voyage charter. That argument is without merit since the LHWCA defines vessel to include one who charters a vessel.

> The term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.

33 U.S.C. § 902(21).

Because of the result we reach here, we need not reach the merits of the other errors assigned pertaining to the jury instructions on the grounds of negligence, failure to submit special interrogatories to the jury requiring them to express negligence of the parties in percentage terms, and the instruction which referred to a paragraph from the charter agreement. We also do not reach in this case the standard of negligence to be used in a case brought under the LHWCA. As can be seen from the portions of the House Report, quoted at p. 511 infra, it was the intent of Congress to place the vessel and employee in the same position as if the injury had occurred on land. It was also the intention of Congress to have a uniform federal law. However, the courts have already split on the proper standard of negligence. The Second and Fifth Circuits have adopted the standard of care in Restatement (Second) of Torts §§ 342, 343, and 343A, which relate to a landowner's liability to invitees or licensees. See Brown v. Mitsubishi Shintaku Ginko, 550 F.2d 331 (5th Cir. 1977); Gay v. Ocean Transp. & Trading, Ltd., 546 F.2d 1233 (5th Cir. 1977); Napoli v. Hellenic Lines, Ltd., 536 F.2d 505 (2d Cir. 1976). The Fourth Circuit has approved the use of Restatement (Second) § 343 in Anuszewski v. Dynamic Mariners Corp., Panama, 540 F.2d 757 (4th Cir. 1976), cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). The Third Circuit in Hurst

remand to the district court with instructions to enter judgment for defendant-appellant MIC and to dismiss the complaint.

 The test for the appropriate grant of a judgment notwithstanding the verdict is whether, without the need for weighing the credibility of witnesses, the evidence and its inferences, considered as a whole and viewed in the light most favorable to the party against whom such motion is granted, can support only one reasonable conclusion, i. e., that the moving party is entitled to judgment notwithstanding the adverse verdict. *Wagle v. Murray*, 560 F.2d 401, 403 (9th Cir. 1977); *Cockrum v. Whitney*, 479 F.2d 84, 85–86 (9th Cir. 1973). Moreover, when a motion for a judgment notwithstanding verdict is erroneously denied by a District Court, the Court of Appeals may order that the proper judgment be entered. *Neely v. Martin K. Eby Construction Co.*, 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967).

The series of events leading up to this lawsuit are made more complex because of the numerous companies involved. Defendants MIC and PAC entered into a voyage charter agreement on November 14, 1972, whereby MIC chartered PAC Barge 312–1 in tow of a PAC tug to haul urea which Georgia-Pacific Corporation had purchased of MIC, from Kenai, Alaska, to Stockton, California.[2] MIC in turn subchartered the barge to Mitsubishi Gas Chemical Limited (MGC) which with Collier Carbon and Chemical Co. (Collier) owns a urea plant in Kenai, Alaska. Mr. Tsuboi, who was the new business coordinator for MIC during the time relevant here, maintained at the trial that MGC and MIC were separate entities. Tsuboi testified that MIC was functioning as a freight broker by obtaining the barge and selling the urea for MGC, which still held title to it during the voyage. The voyage charter was approved by MGC prior to its making. The voyage charter provided that PAC made no warranty as to fitness of purpose of the barge and acceptance by MIC constituted an admission of suitability. The charter agreement also stated that, in the event the augers would not handle the cargo, MIC had sole responsibility for unloading the barge. Thomas Garside of PAC testified that the language of the charter agreement was to protect PAC in case the augers would not discharge urea in the same manner as grain.[3] The evidence

---

*v. Triad Shipping Co.*, 554 F.2d 1237 (3d Cir.) *cert. denied*, —— U.S. ——, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977) has referred to Restatement (Second) § 409, which applies to independent contractors. That section provides:

> Except as stated in §§ 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants.

The Third Circuit has specifically disapproved of the use of §§ 343 and 343A. *See Hurst, supra* at 1249 n.35; *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 n.10 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). We note the Supreme Court of Oregon, sitting en banc, has also disapproved of the use of §§ 343 and 343A. *See Shepler v. Weyerhaeuser Co.*, 279 Or. 477, 569 P.2d 1040 (1977).

We feel that in this case we do not need to decide how negligence or duty is to be stated and leave that for another day. It is clear that the record would support a finding of negligence of the stevedore but cannot support a finding that the injury was attributable to any act or omission of MIC.

2. We note that MIC's brief mentions a November 20, 1972 charter agreement covering five voyages between Kenai, Alaska, and Coos Bay, Oregon/Stockton, California. No such charter agreement is found in the record or has been furnished this court. The injury here did occur at Coos Bay, Oregon. Footnote 2 of Davison's brief states that, although the charter agreement provided for two discharges at Stockton, the second cargo was discharged at Coos Bay. None of this has any relevance to the merits of the dispute, but is mentioned solely to present the facts as accurately as possible based upon our review of the briefs and the evidence adduced at trial.

3. The trial court made reference to this paragraph of the charter agreement when instructing the jury on the duties of PAC, MIC, and the stevedore. MIC has alleged error in this instruction. In light of Garside's testimony, it seems apparent this paragraph was intended only to insulate PAC from paying any additional costs incurred in getting the cargo out if the augers on the barge could not perform the job. Under these circumstances we do not see how such a paragraph can be read to insulate PAC from negligence, especially when we recall Garside's admission during cross-examination that he knew urea caked. It is possible the jury

showed the barge had mostly been used for grain, although urea had been hauled in it prior to this charter. Garside testified that the risk inherent to men never came up in drafting the language of the charter.

Georgia-Pacific contracted with Jones-Oregon for Jones-Oregon to unload the cargo. From the agreed facts in the Pretrial Order, which require no proof, we learn:

7. Under its agreement with G–P, Jones-Oregon was responsible for determining how to discharge the urea from the barge.

\* \* \* \* \* \*

10. Neither MIC nor [PAC] had a contract with Jones-Oregon for discharging urea from the barge.

R, Vol. I, at 181. Georgia-Pacific had investigated the unloading of urea from Barge 312–1 prior to the signing of the voyage charter. An interdepartmental communication dated November 3, 1972, stated that three Georgia-Pacific employees visited Collier's urea unloading facilities at Rivergate, Oregon, on October 31 and November 1, 1972, to watch the unloading of Barge 312–1. The report makes several suggestions for improving the efficiency and reducing the manpower needed during the unloading process. None of these suggestions were ever put into effect. A copy of this report was sent to MIC's Seattle office, and the evidence showed it was seen by Mr. Tsuboi before the voyage charter was made. There was no evidence that the report was ever seen by Jones-Oregon. However, Jones-Oregon had independently investigated the unloading of urea from Barge 312–1 prior to the voyages made under the charter agreement here involved. Leland

Roundtree, the Oregon Coast Manager for Jones-Oregon, testified that he had gone to Stockton and observed the urea there was dusty and "more or less" free flowing (as opposed to caked). Roundtree also observed urea in Barge 312–1 during its first visit to Coos Bay, Oregon, in March of 1973. At that time Roundtree and two other persons were buried to their waists inside one of the silos when a wall of urea gave way as they were standing there talking.

On June 22, 1973, Davison was working in one of the five silos on Barge 312–1 when a wall of urea collapsed and he was partially buried and pinned by the urea. The barge was designed to be self-unloading with three chutes in each silo floor through which the cargo was supposed to flow. Each silo had sweep augers which would rotate around the sides to draw the cargo to the middle of the floor so it would go down the chutes. The urea here was caked and hard.[4] The sweep augers would become embedded in the urea walls, and the urea would break off in chunks too large to go through the chutes. Longshoremen would have to go in with long poles to free the augers and break up the chunks. There were 25 to 30 foot cliffs of urea on the sides of the silo.

Jerrold Wyatt, the walking boss for Jones-Oregon, who was supervising the unloading of the urea, was unaware that Roundtree had been buried to his waist by the collapse of a urea wall. Wyatt testified he was not given any instructions by his supervisors (one of whom was Roundtree) as to the method of unloading the cargo and that he was not personally familiar with urea. The only instructions Wyatt

was misled by this instruction. It would seem the entire charter agreement should have been considered by the jury, together with all of the other evidence introduced, instead of singling out one paragraph of a multi-paragraph agreement.

4. The chemical composition, manufacturing process and uses of urea were never adequately explained at trial due to the fact that no one from MGC (who manufactured the urea but was not a party to this suit) testified at trial, and Mr. Tsuboi, of MIC, denied any knowledge of urea or its properties. Davison, Jerrold

Wyatt (the walking boss for Jones-Oregon), and Thomas Garside (the senior vice-president of PAC who negotiated the voyage charter with Tsuboi) likewise denied any knowledge of urea or its properties. Garside did admit on cross-examination that the barge had been previously chartered to haul urea and that he knew before chartering it to MIC that there was trouble with the urea caking. There was no expert testimony scientifically explaining the caking of urea. It is clear that it caked on this voyage and had caked on others.

gave the men were to stay away from the overhangs and to break up the clots so they would not clog the bottom of the troughs. Davison was breaking up chunks about ten feet from the wall when he was injured.

MIC could only be liable to Davison in this case if it was found negligent in some respect. The relevant statute here is 33 U.S.C. § 905(b), which provides:

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

The history of the 1972 amendments to the LHWCA has been detailed in the Congressional Reports, see H.R.Rep.No.92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News p. 4698. *See also Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1241–44 (3d Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Munoz v. Flota Merchante Grancolombiana, S. A.*, 553 F.2d 837, 839–40 (2d Cir. 1977). Suffice it to say that prior to the 1972 amendments the compensation to which an injured employee was entitled from his stevedore employer was usually inadequate. The employee then sought additional compensation by suing the vessel, which was held liable regardless of fault by the courts under a theory of "seaworthiness." As the House Report notes, a vessel could be found unseaworthy even though the condition was caused, created or brought into play by the stevedore or its employees. [1972] U.S.Code Cong. & Admin.News at p. 4702. The vessel in turn was allowed by the courts to sue the stevedore company for reimbursement if the stevedore was partially negligent. The 1972 amendments changed all this by increasing the compensation for the injured worker, eliminating the doctrine of unseaworthiness so that vessels could no longer be held liable solely because of the stevedore's negligence, and providing that the vessel could not require indemnity from the stevedore if there was joint negligence.[5] The House Report is helpful in understanding these new concepts:

The Committee believes that especially with the vast improvement in compensation benefits which the bill would provide, there is no compelling reason to continue to require vessels to assume what amounts to absolute liability for injuries which occur to longshoremen or other workers covered under the Act who are injured while working on those ves-

---

5. *See Dodge v. Mitsui Shintaku Ginko K. K. Tokyo*, 528 F.2d 669 (9th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *Shellman v. United States Lines, Inc.*, 528 F.2d 675 (9th Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976). *But see Edmonds v. Compagnie Generale Transatlantique*, 558 F.2d 186 (4th Cir. 1977), which interprets the Congressional history of the LHWCA and Supreme Court opinions to allow a reduction in the vessel's monetary liability by limiting recovery to:

a sum equal to that part of the whole measured by its own fault . . . plus any valid lien the stevedore may have on the recovery by the longshoreman, but of course not to exceed the whole amount of the possible award against the vessel.

*Id.* at 194.

sels. In reaching this conclusion, the Committee has noted that the seaworthiness concept was developed by the courts to protect seamen from the extreme hazards incident to their employment which frequently requires long sea voyages and duties of obedience to orders not generally required of other workers. The rationale which justifies holding the vessel absolutely liable to seamen if the vessel is unseaworthy does not apply with equal force to longshoremen and other nonseamen working on board a vessel while it is in port.

Accordingly, the Committee has concluded that, given the improvement in compensation benefits which this bill would provide, it would be fairer to all concerned and fully consistent with the objective of protecting the health and safety of employees who work on board vessels for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness. This would place vessels in the same position, insofar as third party liability is concerned, as land-based third parties in non-maritime pursuits.

The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness", "non-delegable duty", or the like.

Persons to whom compensation is payable under the Act retain the right to recover damages for negligence against the vessel, but under these amendments they cannot bring a damage action under the judicially-enacted doctrine of unseaworthiness. Thus a vessel shall not be liable in damages for acts or omissions of stevedores or employees of stevedores subject to this Act, * * *; for the manner or method in which stevedores or employees of stevedores subject to this Act perform their work, * * *; for

gear or equipment of stevedores or employees of stevedores subject to this Act whether used aboard ship, or ashore, * * or for other categories of unseaworthiness which have been judicially established. This listing of cases is not intended to reflect a judgment as to whether recovery on a particular factual setting could have been predicated on the vessel's negligence.

Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances. The vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore.

\* \* \* \* \* \*

Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law. In that connection, the Committee intends that the admiralty concept of comparative negligence, rather than the

common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of "assumption of risk" in an action by an injured employee shall also be applicable. [1972] U.S.Code Cong. & Admin.News at pp. 4703–05 (citations omitted).

The grounds of negligence submitted to the jury in this case related to the design of the barge and the failure to uncover the silos or require the silos to be uncovered.[6] Plaintiff did not claim defendants were negligent in failing to warn of a hazardous condition of which defendants knew or should have known and of which the longshoremen should not be expected to discover or realize. However, the trial court without objection voluntarily instructed the jury that defendants had such a duty and would be negligent if they breached it.

■ Appellee Davison's theory in the lower court was that there was no safe way of discharging urea from a closed-silo barge. Davison contends on this appeal that it is immaterial that MIC had no right to control the unloading of the vessel, did not supervise its unloading, or dictate the method of its unloading. The facts of this case simply do not support Davison's contentions. There is no evidence that MIC knew that urea could not be discharged safely from this barge or knew of the possibility of cliffing or any other safety hazard.

The possibility of a corporate relationship between MGC and MIC (such relationship was never proven) does not mean that MIC was automatically aware that shipping the product in this particular barge would create safety hazards in its unloading. It is true Tsuboi knew that the urea would not discharge from the vessel as quickly as grain, but from this it does not follow that he knew urea could form hazardous walls during the discharge that would give way. Tsuboi was furnished a copy of Georgia-Pacific's interdepartmental memo containing suggestions for improving the discharge of urea from Barge 312–1 and avoiding the use of longshoremen. Although the report did mention auger covers to protect the augers from falling urea, there was nothing in the report to suggest that its falling was not the natural result of the augers working. The report never mentioned cliffing. There was no evidence that MIC was aware that Georgia-Pacific had chosen not to implement any of the suggestions in the memo which would have reduced the need for men in the silos. As a matter of fact, as between MIC and Georgia-Pacific, MIC had no duty to discharge or unload the cargo. It logically follows that, since Davison could not show MIC knew the barge was not designed to discharge the cargo, he could not prevail on the claim that MIC had a duty to require the silo domes to be taken off.

In contrast to the above, Georgia-Pacific and Jones-Oregon had first-hand knowledge of the discharge of urea. Georgia-Pacific

6. The claims of negligence submitted were:

In using for the transport of urea a barge so designed and constructed and equipped that urea could not be safely discharged from the barge. In utilizing for the transport of urea a barge with an auger which was an inadequate design and/or power to move the stowed urea. In utilizing for the transport of urea a barge so designed and constructed that there was no adequate and safe space within which to perform the work of discharging the cargo. In failing to uncover or require the silos to be uncovered so that a clamshell or similar crane could be used to remove the urea from the barge.

R, Vol. III, at 269–70. MIC objects to these instructions on appeal on the ground that they constituted claims of unseaworthiness. MIC

did not object on this ground at the time of trial, and we do not decide this issue. We do note that, although the trial court did instruct the jury that negligence was the doing or the failure to do that which a reasonably careful person would or would not have done, the grounds of negligence outlined did not specifically state that in order to be held liable it must be shown that MIC knew or should have known that the barge as equipped was incapable of safely discharging urea. See H.R.Rep. No.92–1441, quoted at p. 511 ante (which makes it clear there must be some knowledge, either actual or imputed, on the part of the vessel of the hazardous condition). This may be another reason why the jury reached a verdict contrary to the evidence.

investigated the discharge of urea prior to the voyage charter, was concerned with the unloading of it and hired the stevedore. Jones-Oregon also had investigated the unloading of urea from this barge prior to Davison's accident and their Oregon Coast Manager, Mr. Roundtree, and two others, as above noted, were buried to their waists when a wall of urea gave way. Roundtree admitted that a stevedore company directs the performance of the work by the men, determines the safety of the vessel, has the responsibility for providing ongoing supervision of the work as it progresses, and has the responsibility for discharging the cargo and deciding how it will be discharged. Although the evidence was conflicting, there was evidence that a safer method of discharge could have been used in this case. There was testimony from Walter Smith, the Corporate Safety Engineer of a competitor stevedore company, that in his opinion the proper method of unloading this cargo from this particular barge was to have men go in from the top of the silos and keep the urea going down as level as possible to avoid forming cliffs.

Larry Huntsucker was running an auger from outside the silo the night of Davison's accident. He testified that prior to Davison's accident he did not think the job was safe, and that after Davison's accident the longshoremen shut the job down and demanded that changes be made in the working procedures. Huntsucker testified that, when the men came back to the job, they went in from the top of the silo wearing safety harnesses in order to break the cliffs of urea down, and that this method worked fairly well. Wyatt, the walking boss of Jones-Oregon, who was directly responsible for supervising the job the night Davison was injured, also testified that he could have shut the job down if he considered it unsafe and that longshoremen had the right to refuse to work when they believed conditions unsafe. Regrettably, the job was not shut down in this case until an injury occurred, even though at least one longshoreman thought the job was unsafe.

In summary, we find no evidence to support a finding that MIC had knowledge of the safety hazards attendant with this cargo or of how the urea should be unloaded. For this court to uphold plaintiff's verdict and ignore the fact that Georgia-Pacific and Jones-Oregon had control of the unloading process, had knowledge of the nature and attendant dangers of the cargo, and by proper unloading techniques Jones-Oregon, and probably Georgia-Pacific also, could have prevented the injury to Davison is to ignore the proximate cause of this accident. Jones-Oregon took no precautions in the removal of the cargo to prevent walls from forming, to avoid having men working underneath them, or to warn the longshoremen that this was a possible hazard, notwithstanding the fact one of their own supervisors had been buried by a urea wall giving way.

To hold MIC liable in this case would be a return to the strict liability unseaworthiness doctrine which Congress has eliminated. This case is reversed and remanded to the district court for dismissal of the complaint against MIC. In accord with this result, PAC is not entitled to indemnity from MIC for any costs incurred.