WILLIAM INGLIS & SONS BAKING CO. et al., Plaintiffs,

v.

ITT CONTINENTAL BAKING COMPANY, INC., et al., Defendants.

AMERICAN BAKERIES COMPANY, a corporation, and Langendorf United Bakeries, Inc., a corporation, et al., Counterclaimants,

v.

WILLIAM INGLIS & SONS BAKING CO., a corporation, et al., Counterclaim Defendants.

No. C–71–1906 SW.

United States District Court, N. D. California.

Oct. 2, 1978.

412

Broad, Khourie & Schulz, Michael N. Khourie, Royce H. Schulz, Eugene C. Crew, Raymond L. Ocampo, Jr., San Francisco,

Cal., Harold Greenwald, New York City, for plaintiffs and counterclaim defendants.

Robert D. Raven, James J. Garrett, Barry E. Carter, Morrison & Foerster, San Francisco, Cal., John H. Schafer, III, Charles E. Buffon, John D. Taurman, Covington & Burling, Washington, D. C., for defendants, ITT Continental Baking Co., Inc. and Di Carlo's Baking Co.

Richard S. Haas, Michael B. Flesch, Brobeck, Phleger & Harrison, San Francisco, Cal., John T. Cusack, Thomas Campbell, John P. McGuinnis, Gardner, Carton & Douglas, Chicago, Ill., for defendants, American Bakeries Co. and Langendorf United Bakeries, Inc.; Mitchell J. Wiet, Chicago, Ill., of counsel.

Edward L. Foote, Terry M. Grimm, Winston & Strawn, Chicago, Ill., Gary Stephen Anderson, Farella, Braun & Martel, San Francisco, Cal., Ray Sandy Sutton, Kansas City, Mo., for defendant, Interstate Brands Corp.

## MEMORANDUM AND ORDER

SPENCER WILLIAMS, District Judge.

Plaintiff William Inglis & Sons Baking Co. (hereinafter Inglis) was an independent wholesale baker in the San Joaquin Valley prior to going out of business in April 1976. It manufactured and distributed bread and bread-type rolls in the San Francisco Bay Area, the Sacramento Valley, the San Joaquin Valley, parts of the Mother Lode country and of Lake Tahoe.

In 1971, Inglis and several other bakers brought this action against competing independent wholesale bakers alleging antitrust violations in the Northern California, Southern California and the Northwest markets. In 1977, this court ordered separate trials for each market. Trial for the Northern California market commenced in March 1978. This trial involved plaintiff Inglis and defendants ITT Continental Baking Co. (hereinafter Continental) and American Bakeries Co. A third Northern California market defendant, Campbell-Taggart, entered into a settlement agreement with the plaintiff prior to trial.[1]

After a five-week trial, the jury returned a verdict against defendant Continental in the amount of $4,416,474 on the claims brought pursuant to § 2 of the Sherman Act (15 U.S.C. § 2) and the Robinson-Patman Act (15 U.S.C. § 13) and of $631,526 on the claims brought pursuant to the California Unfair Practices Act (Cal.Bus. & Prof. Code § 17000 *et seq.*). The jury found no liability on the part of defendant American Bakeries Co. and also returned a verdict of no liability on the counterclaim brought by American against Inglis.

The case is presently before this court on motion of defendant Continental for a Judgment Notwithstanding the Verdict and for a New Trial. For the reasons set forth below, this court finds that a JNOV and, in the alternative, a new trial is appropriate as to the Federal Sherman Act and Robinson-Patman claims. A new trial only is granted with respect to the claim brought under the California Unfair Practices Act.

## STANDARD OF REVIEW

■ In determining whether a JNOV is appropriate, the trial court must ascertain "whether, without the need for weighing the credibility of witnesses, the evidence and its inferences, considered as a whole and viewed in the light most favorable to the party against whom such motion is granted, can support only one reasonable conclusion." *Davison v. Pacific Inland Navigations Co.,* 569 F.2d 507, 509 (9th Cir. 1978); *Kay v. Cessna Aircraft Co.,* 548 F.2d 1370, 1372 (9th Cir. 1977).

■ In contrast to a JNOV, a new trial motion allows the trial judge to reweigh the evidence. Generally, a new trial may be granted where the verdict is against the

---

1. The settlement agreement resulted in payment of approximately $3.5 million to Inglis by Campbell-Taggart. A disputed portion of that amount constituted purchase of the land and buildings belonging to Inglis in the Stockton area and bakery fixture and equipment also owned by Inglis. Inglis contends that only $800,000 of the $3.5 million was paid in settlement of the antitrust claims. Continental asserts that the settlement figure is much higher.

weight of the evidence, where the damages are excessive, where the trial was unfair or where substantial errors were committed in the admission or rejection of evidence or in the jury instructions. 11 Wright and Miller, *Federal Practice and Procedure*, § 2805 (1973). The grant or denial of a new trial motion pursuant to Federal Rule of Civil Procedure 59 is committed to the sound discretion of the trial judge. Exercise of this discretion should be used to prevent the miscarriage of justice.

## ATTEMPT TO MONOPOLIZE—SHERMAN ACT § 2

The basis of the § 2 attempt to monopolize claim is alleged predatory activity by Continental in the sale of bread—more particularly in the sale of its private label bread. The primary products involved in this case are the one pound and one and one-half pound white pan bread. White pan bread is sold by wholesale bakers under an advertised label, a secondary label and a private label. The advertised label is generally a national brand name available to all stores. Continental, for example, markets under the Wonder Bread label. Inglis utilized the Sunbeam label. Secondary label is similar bread marketed under a different name and at a lower price than advertised label.[2] Private label bread is a label individual to the purchasing store and available at a lower price than the advertised label product.

In the late 1960's and early 1970's, the emergence of captive bakeries—those constructed by large chain stores such as Safeway and Alpha Beta for the purpose of producing their own bread—created extensive surplus capacity in the independent bakeries in the Northern California market. This engendered fierce new competitive activity. Much of this activity was devoted to selling private label bread to the smaller grocery chains that had not acquired captive bakeries. The principal benefit derived from landing a private label account was the preferential shelf space for sale of the more profitable advertised brand bread which customarily followed.

The predatory conduct underlying the § 2 claim is Continental's alleged below-cost sales of its private label bread for the purpose and with the effect of injuring competition. More specifically, Inglis contends it was Continental's purpose to hold the line on pricing in order to drive the weaker wholesalers out of business. It is the plaintiff's theory that Continental intended to drive the weaker bakers out in order to subsequently raise the price of private label bread to bring it more in line with the price of Wonder Bread so that a high level of Wonder Bread sales could be maintained.[3]

In order to withstand the JNOV motion, the plaintiff must have introduced sufficient evidence at trial to establish a prima facie case under § 2. The prima facie case is composed of three elements: first, a specific intent to control prices or destroy competition with respect to a part of commerce; second, predatory conduct directed toward accomplishing the unlawful purpose; and, third, a dangerous probability of success.[4] *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 853 (9th Cir. 1977), *appeal pending,* 46 U.S.L.W. 3754

---

2. The evidence shows that in some instances the secondary and private label prices were identical.

3. Inglis relied heavily at trial on the so-called "McKinsey documents" to establish intent. These were reports and related internal memoranda produced in connection with a study prepared by McKinsey and Co. for ITT Continental Baking Co. relating to private label bread.

4. The Ninth Circuit has indicated in several opinions that proof of a dangerous probability of success is not necessarily an essential element of an attempt to monopolize claim.

*Greyhound Computer v. International Business Machines,* 559 F.2d 488, 504 (9th Cir. 1977) *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 813–14 (9th Cir. 1976) *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). The *Janich* opinion indicates this element may easily be inferred from proof of predatory intent which in turn may be inferred from proof of predatory conduct. *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 854 (9th Cir. 1977), *appeal pending,* 46 U.S. L.W. 3754 (1978).

(1978). The first and third elements may, in *some* instances, be inferred from proof of the second element. *Id.* However, the existence of predatory conduct must be established by direct proof. This the plaintiff has failed to do.

 Decreases in the price of private label bread and a continuation of this low pricing on the part of Continental form the basis of Inglis' predatory pricing charge. However, price decreases and continued low pricing alone are insufficient to substantiate a § 2 claim. Legitimate price decreases will always affect competitors and cause losses for inefficient firms. The antitrust laws are designed to foster vigorous and healthy competition—not to protect the inefficient producer. *Janich Bros., Inc. v. American Distilling Co., supra,* 570 F.2d at 856 n.7; *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358–59 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Instead, predatory and thus illegal pricing exists only where a firm foregoes "present profits in order to create a market position in which it could charge enough to obtain supranormal profits and recoup its present losses." *Hanson v. Shell Oil Co., supra,* 541 F.2d at 1358; *Janich Bros., Inc. v. American Distilling Co., supra,* 570 F.2d at 856; *International Air Indus., Inc. v. American Excelsior Co.,* 517 F.2d 714, 723 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

The problem lies in ascertaining a workable formula for determining at what pricing level this situation will occur. There is considerable debate as to what the appropriate standard is and how it should be applied. *See, e. g.,* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L. Rev. 697 (1975); Scherer, *Predatory Pricing and the Sherman Act: A comment,* 89 Harv.L.Rev. 869 (1976); Areeda & Turner, *Scherer on Predatory Pricing: A Reply,* 89 Harv.L.Rev. 891 (1976); Scherer, *Some Last Words on Predatory Pricing,* 89 Harv.L. Rev. 901 (1976); Williamson, *Predatory Pricing: A Strategic & Welfare Analysis,* 87 Yale L.J. 284 (1977); Areeda & Turner, *Williamson on Predatory Pricing,* 87 Yale L.J. 1337 (1978). The Ninth Circuit has determined that the appropriate predatory pricing standard is whether a firm sets prices below its marginal cost.[5] *Janich Bros., Inc. v. American Distilling Co., supra* 570 F.2d at 858. When prices are set below marginal cost, rivals will be forced from the market for reasons unrelated to efficiency and the seller will be producing goods at a cost greater than their social value. *Id.* at 857–58.

Marginal cost may be defined as "the increment to total cost that results from producing an additional increment of output." Areeda & Turner, *supra,* 88 Harv.L. Rev. at 700. However, because conventional business records often do not reflect marginal cost, the Ninth Circuit has indicated that average variable cost *may* be used as evidence of marginal cost because it is likely to approximate marginal cost. *Janich Bros., Inc. v. American Distilling Co., supra,* 570 F.2d at 858. The court in *Janich,* adopting the Areeda and Turner definition, defines average variable cost as "costs that vary with changes in output. They typically include such items as materials fuel, labor directly used to produce the product, indirect labor such as foremen, clerks, and custodial help, utilities, repair and maintenance, and per unit royalties and license fees. The average variable cost is the sum of all variable costs divided by output." *Id.* at 858 n. 11, *citing* Areeda and Turner, *supra,* 88 Harv.L.Rev. at 700.

Rather than prove sales below marginal cost, plaintiff relied upon the evidentiary substitution suggested in *Janich* to establish its predatory pricing claim. To prove that Continental's private label prices were below average variable cost, it utilized studies

---

**5.** It should be noted that prior to *Janich* this court ruled that the appropriate cost standard is that of fully allocated cost. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 389 F.Supp. 1334, 1342 (N.D.Cal.1975).

The standard articulated in *Janich* and *Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), is now controlling.

prepared by an accounting expert, Mr. Clifford Kupperberg, for the four-week period ending July 22, 1972 and the five-week period ending September 29, 1973 for the one pound expanded white pan bread (Plaintiff's Exhibits P–412 and P–427). Kupperberg prepared the studies from Continental documents based on the average variable cost definitions given to him by plaintiff's counsel. These definitions were taken from the *Janich* opinion and from the first Areeda and Turner article. Included in the variable cost analysis were all costs excepting plant depreciation, real estate and personal property taxes, and business licenses. Such items as the cost of Continental's transport truck purchase were included as variable because trucks were leased and therefore expensed rather than purchased and depreciated as a capital asset.

Mr. Kupperberg's 1972 analysis reflected average variable costs of 20.60 cents per loaf. The price in July 1972 was 17.2 cents per loaf resulting in sales below cost of 3.40 cents per loaf. The 1973 study showed an average variable cost of 25.49 cents per loaf. The price on September 17, 1973 was approximately 22 cents per loaf, again reflecting sales below average variable cost. It is this evidence which Inglis relies upon to establish the existence of Continental's predatory pricing activity.

■ While technically complying with the definitions set forth by the Ninth Circuit in the *Janich* opinion, this evidence does not comport with the meaning and purpose of predatory pricing established in both *Janich* and *Hanson*. It is insufficient as a matter of law. The court in *Janich*, relying heavily on the Areeda and Turner analysis, indicates that the appropriate standard for determining predatory pricing is short-run marginal cost. This standard controls. The court recognizes the need, in some instances, to use average variable cost as evidence of marginal cost due to record-keeping difficulties. But, in this case, evidence produced at trial indicates that the average variable cost does not approximate marginal cost.

During the time period in question, both excess production and distribution capacity existed in the wholesale baking industry in Northern California.[6] Oven time was often available during periods where wages were already being paid. Excess space was available on delivery trucks. The only additional short-run expenses for incremental increases in production were ingredients, wrappers, fuel and commission. Items of truck rental, additional wages or additional drivers, which in other industries might constitute both incremental and variable expenses, were not such short-run expenses here.

The excess capacity means that the average variable cost and the marginal cost will be disparate—that the average variable cost will be substantially higher than marginal cost. Items otherwise included in the average variable cost definition will not vary with incremental changes in production. Therefore, use of the average variable cost standard actually distorts the marginal cost and is not good evidence thereof.

■ Inglis argues that even in situations where such a disparity between marginal and average variable costs exists, the latter is still the appropriate evidentiary standard. It relies heavily on the Ninth Circuit's apparent adoption of the Areeda and Turner rationale, Areeda & Turner, *supra,* 88 Harv.L.Rev. at 717, and points to language in their first article, wherein the authors recognize that even where average variable cost is higher than marginal cost, average variable cost is the appropriate test on principle because the firm is loss minimizing. Plaintiff's reliance on broad theoretical statements unrelated to proven facts cannot control the disposition of the individual case. If it is evident in a particular case that profit maximization will occur at mar-

**6.** The ability of Inglis and other smaller bakers to easily absorb the demand during a two-month strike in 1972 when neither the Conti- nental nor the Campbell-Taggart plants were operating is good evidence of this excess capacity.

ginal, but below average variable cost,[7] then adherence to rigid definitions is both unnecessary and unjust. In such a situation, average variable cost cannot be used as prima facie proof of a violation. To follow blindly the average variable cost standard when it is not otherwise warranted would make meaningless the holding in *Janich* that marginal cost is the proper test.

Inglis argues that the average variable cost standard must be applied because marginal cost is incapable of proof—that it cannot be ascertained from conventional business records. This is indeed what the *Janich* opinion states, *Janich Bros., Inc. v. American Distilling Co., supra,* 570 F.2d at 857. Yet, it is doubtful that *Janich* is intended to be read in such a dogmatic fashion. Where the retrospective calculation of marginal cost is equally as accurate as that of average variable cost, there is no necessity for use of the surrogate. The optimum level is defined as marginal cost. If, in a particular case, it is possible to determine marginal cost, it should be utilized as the standard. Moreover, even if it cannot be determined from conventional records, when it is clear that the calculated average variable cost encompasses items which do not reflect incremental costs, such costs should be deducted. That is the case here with certain items of transport and labor. In other words, where, as here, the particular facts of a case indicate the average variable cost to be misleading, it should not be rigidly adopted as the predatory pricing standard.

■ The failure of the plaintiff to adduce competent evidence of sales below marginal cost dictates the award of a JNOV.

■ Even if this court were to allow evidence of sales below average variable cost as prima facie proof of predatory pricing, defendants are entitled to a new trial because of the unreliability of the average variable cost study prepared by plaintiff. The 1973 study showed an average variable cost of 25.49 cents per loaf and a fully allocated cost of 27.33 cents. This makes the average variable cost 93% of the fully allocated costs. While all costs in the long run are variable, such a high percentage in a short run analysis is suspect. It indicates an attribution of too many short-run fixed costs to the variable cost calculation. Furthermore, plaintiff's expert merely applied definitions given him by counsel and made allocations and arithmetical computations from Continental's documents. He made no effort to determine whether the calculations made did in fact yield average variable cost.

## ROBINSON–PATMAN

The jury also returned the verdict against Continental for violations of § 2(a) of the

---

7. The average variable cost and the marginal cost in an industry with excess capacity are portrayed in the following graph:

The Ninth Circuit has determined that the appropriate predatory pricing standard is whether a firm sets a price below its marginal cost. That is, assuming that Continental is producing $Q_1$ quantity of bread, only if the selling price were less than $P_1$ would the Ninth Circuit determine that predatory pricing is occurring.

The plaintiff has attempted to show predatory pricing by proving that the price was below average variable cost. According to the graph, any price below $P_3$ satisfies plaintiff's contention. However, by looking at the graph, it is clear that a price which is less than $P_3$ can easily be greater than $P_1$. Thus, if Continental sold bread at any price between $P_1$ and $P_3$, such as $P_2$, it does not violate the Ninth Circuit's standard for predatory pricing. Continental could still increase its production to $Q_2$ and maintain a profit maximizing, non-predatory short-run position.

Although a price which is less than $P_3$ could also be less than $P_1$ (and hence in violation of the Ninth Circuit's standard), the plaintiff had the burden of proof of this fact. This court cannot assume such a fact when it has not been proven.

Robinson-Patman Act, 15 U.S.C. § 13(a),[8] which prohibits unlawful price discrimination. Plaintiff premised the Robinson-Patman claim on several levels of discrimination: 1) discrimination in the price of private label bread between California and Nevada; 2) discrimination in the price of advertised label bread between California and Nevada; and 3) discrimination evidenced by price differentials between advertised and private label bread in sales in Nevada and California and in sales of the two products wholly within California.

■ In order to establish a prima facie violation of the Act, plaintiff must prove: 1) the alleged price discrimination meets the "in commerce" requirement—that "either or any" of the purchases involved are in commerce; 2) there has been discrimination in price between different purchasers of products of like grade and quality; and 3) the effect of the discrimination "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination . . . ." The proof in this case must be examined separately with respect to the alleged discriminations between Nevada and California and the alleged discrimination wholly within California.

### 1. California-Nevada Transactions

■ There is evidence in the record of price differentials in the sale of private label bread by Continental between California and Nevada prior to 1973. Similarly, there is such evidence for advertised label bread prior to 1971. It is also undisputed that price differentials existed between pri-

vate and advertised label bread in "both markets. Clearly these sales meet the in-commerce requirement. However, they are insufficient to establish a violation because their *de minimis* nature precludes any substantial effect on competition. One of the primary accounts relied upon to establish the interstate price differentials was the Nevada Mayfair account. This account constituted "way less than one percent" (TR 386) of the Northern California Continental sales. Where the higher priced sales were so minimal in relation to Continental's market-wide sales, there could be no substantial effect on competition. *See, Zoslaw v. Columbia Broadcasting System,* 1977–2 Trade Cas.Par. 61,756 at 73,126 (N.D.Cal. 1976); *International Air Indus., Inc. v. American Excelsior Co., supra,* 517 F.2d at 725 n.32.

### 2. Discrimination Within California

■ The major thrust of the plaintiff's Robinson-Patman case is aimed at the price differentials between private label and the advertised label Wonder Bread within California. It is undisputed that these differences in prices existed. Such differentials alone establish the element of discrimination required by the statute. *F. T. C. v. Anheuser-Busch, Inc.,* 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960).

■ However, Continental has consistently argued that no liability can arise in connection with the wholly intrastate California sales because one of the purchases is not "in commerce." This argument was made at the preliminary injunction stage of this case and rejected. The "few obvious interstate transactions (between California and Nevada) are sufficient . . . to

**8.** 15 U.S.C. § 13(a) provides:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District

of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

bring the whole panoply of alleged intrastate price discriminations within the subject matter jurisdiction requirements of Robinson-Patman § 2(a)." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 389 F.Supp. 1334, 1340 (N.D.Cal. 1975). This court is not persuaded such analysis was or is incorrect.

Continental also argues that there can be no Robinson-Patman claim because the private and advertised labels are not of like grade and quality. The evidence showed that the primary differences between the two labels were the wrapper and the freshness assurance. Wonder Bread is removed from the shelves after 48 hours whereas private label is customarily removed only twice a week. As for ingredients, the two products were identical prior to 1972. After the 1972 strike, Continental enriched its Wonder formula by using shortening and cane sugar instead of the lard and corn syrup previously used. The substitution was not made in the private label formula.

■ The difference in labeling alone is insufficient to preclude Robinson-Patman jurisdiction. In *F. T. C. v. Borden, Co.,* 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966), the Supreme Court held that private and advertised label milk which was physically identical and of equal quality fell within the "like grade and quality" standard. The label differences and the economic factors such as consumer preferences caused by brand names and advertising are not to be considered in making the "like grade and quality" determination. Rather, they are factors to be considered under the injury and cost justification provisions of the statute. *Id.* at 646, 86 S.Ct. 1092.

■ The shelf-life freshness difference in the two labels in the instant case constitutes one of the economic factors not controlling in the like grade and quality analysis. The "assurance of freshness" is a difference created by advertising and brand name establishment. In fact, it may be that consumers will buy the identical product if they purchase on the right day. For this reason, freshness is a cost justification factor.

■ The ingredient change after 1972 creates a more difficult question. Although the change made the two labels physically distinctive to a degree, the difference is insubstantial. Furthermore, this change was effectuated by Continental only for a short period of time and only in the Northern California market. Thus, the change may have been only a response to the initiation of this lawsuit. Accordingly, the court finds as a matter of law that the two labels are products of like grade and quality.

■ However, while Inglis has satisfied the first and second elements of its required proof,[9] its failure to establish the requisite competitive effect of the price differentials mandates the entry of a JNOV for the defendant. Price discrimination (price difference) is not in itself illegal. *Continental Baking Co. v. Old Homestead Bread Co.,* 476 F.2d 97, 103 (10th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973). To be actionable it must injure or lessen competition.

■ Although there is no set method for establishing the injury in a primary line case,[10] the likelihood of injury may be in-

**9.** Although the like grade and quality standard was met, plaintiff did not establish that the different prices were not available to all purchasers. No evidence was introduced showing that either the private label or advertised label was denied to any purchaser. While there was testimony that it would be unprofitable to produce private label bread for "mom and pop" groceries, no evidence of a specific request and subsequent refusal for such labels was presented. The mere fact that some buyers may only have purchased either private or advertised label is not relevant. There is only speculation that they could not have purchased both had they so desired. However, because plaintiff has failed to establish the requisite competitive effect of the alleged discrimination, the court need not rule at this juncture whether failure to establish non-availability in a primary-line case is fatal to a prima facie case. *See, Continental Baking Co. v. Old Homestead Bread Co.,* 476 F.2d 97, 107 (10th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973).

**10.** A primary line injury is that suffered by the competitor of the alleged discriminator. A sec-

ferred from a showing of predatory intent. *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 696 n.12, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); *Continental Baking Co. v. Old Homestead Bread Co.*, supra, 476 F.2d at 104. And predatory intent, in turn, may, in a predatory pricing case, be established by showing sales below cost. *Utah Pie Co. v. Continental Baking Co.*, supra, 386 U.S. at 616 n.12, 87 S.Ct. 1326; *F. T. C. v. Anheuser-Busch, Inc.*, supra, 363 U.S. at 552, 80 S.Ct. 1267; *Continental Baking Co. v. Old Homestead Bread Co.*, supra, 476 F.2d at 104. Moreover, predation having the requisite competitive effect may not be established without a showing of sales below cost.[11] Several circuits, including the Ninth, have indicated that in a predatory pricing case, the substantive issues in a Robinson-Patman claim are identical to those of a § 2 attempt to monopolize charge. *Janich Bros. Inc. v. American Distilling Co.*, supra, 570 F.2d at 855; *Pacific Engineering & Production Co. v. Kerr-McGee Corporation*, 551 F.2d 790, 798 (10th Cir.), cert. denied, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160, rehearing denied, 434 U.S. 977, 98 S.Ct. 543, 54 L.Ed.2d 472 (1977); *International Air Indus. v. American Excelsior Co.*, supra, 517 F.2d at 724. In other words, plaintiff must establish that the sales complained of were below marginal cost. As discussed earlier, plaintiff has failed to meet this burden.

 Moreover, plaintiff failed to establish that any injury which it may have suffered resulted from the price differential—that is from the disparity between the Wonder and private label prices. *Borden Co. v. F.T.C.*, 381 F.2d 175, 180 (5th Cir. 1967). Plaintiff complains that the private

label prices were predatory. It has not, however, shown that these low prices were subsidized by the higher priced Wonder bread. The subsidization might, of course, be inferred by a showing of below marginal cost prices, but where such a showing is absent, a relationship between the high and low prices should be separately established. *International Air Indus. Inc. v. American Excelsior Co.*, supra, 517 F.2d at 725 n.32; *Borden Co. v. F.T.C.*, supra, 381 F.2d at 177; *Shore Gas & Oil Co. v. Humble Oil & Refining Co.*, 224 F.Supp. 922, 926 (D.N.J.1963). The failure to establish this causative link constitutes a fatal flaw in plaintiff's Robinson-Patman claim.[12]

Continental is thus entitled to a JNOV, and in the alternative, a new trial on the Robinson-Patman claim because of the failure to show the requisite competitive injury.

## STATE LAW CLAIMS

Continental was found liable by the jury for violations of the California Unfair Practices Act (Cal.Bus. & Prof. Code § 17000 *et seq.*) for the periods October 1, 1970—February 1, 1972 and February 7, 1976—April 6, 1976. The California Unfair Practices Act makes it unlawful to sell a product below cost for the purpose of injuring competitors or destroying competition. Cal. Bus. & Prof. Code § 17043. The cost standard established by statute in California is that of fully allocated cost, Cal.Bus. & Prof. Code §§ 17026, 17029, as opposed to the marginal cost standard adopted by this Circuit in *Janich* and *Hansen* for predatory pricing violations of the federal antitrust laws. Proof of sales below fully allocated costs creates a presumption of the purpose

---

ondary line injury is that suffered by customers of the alleged price discriminator.

**11.** Plaintiff relies heavily on the predatory intent evidence based on the "McKinsey documents." However, evidence of intent absent actual predatory activity is insufficient. As the Fifth Circuit stated in *International Air Indus., Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976), "Vebco must adduce evidence of what AMXCO did; at best,

it showed only what AMXCO might have done." *Id.* at 723.

**12.** Plaintiff argues that the requisite subsidization can be established from evidence of Continental's nationwide profits. This is not enough. There was no proof of the existence of price differentials either nationwide or merely in some other markets of like grade and quality. Furthermore, nationwide profits include sales of numerous bakery products other than bread produced by Continental.

or intent to injure competitors or destroy competition. Cal.Bus. & Prof. Code § 17071.

 Continental is not entitled to a JNOV on the state law claim in its entirety. Although the defendant has continually argued that the federal antitrust laws mandate a marginal cost standard and thus preempt the strict fully allocated cost standard specified by the California statute, this court disagrees. State regulation in the antitrust area is not prohibited and the federal courts are reluctant to infer preemption. *Exxon Corp. v. Governor of Maryland,* 117 U.S. 437, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). The use of the fully allocated cost standard by California does not stand as an obstacle to the effectuation of the purposes and objectives of Congress. *Jones v. Rath Packing,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1976), *rehearing denied,* 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977); *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). In fact, the policies of both the federal and state statutes are identical—to protect competition by prohibiting illegal price discrimination. The marginal cost standard is not necessarily the generally accepted cost standard in predatory pricing cases. Although it has been adopted by several circuits, there is considerable scholarly debate about the issue. The Supreme Court has never ruled on the question and a study of the legislative history understandably fails to cast any light on the subtle nuances between the various definitions of "cost." Preemption is, accordingly, deemed both inappropriate and premature.

 Defendant is, however, entitled to a JNOV on the state claim for violations alleged to have occurred between February 7, 1976 and April 6, 1976. Plaintiff introduced no competent evidence to show that sales between those dates were below fully allocated costs. The Kupperberg studies for 1972 and 1973 were insufficient to substantiate sales below fully allocated costs three or four years later. Continental had increased the price of its one pound private label bread from 18 cents in 1970 to 25.4 cents in December 1975 and 26.4 cents in November 1976. There is no showing by plaintiff that these later prices were below fully allocated costs.

 The Kupperberg 1972 and 1973 studies are sufficient to allow inferences of below fully allocated costs sales for the 1970–72 period. However, the defendants are entitled to a new trial on this portion of the claim because the weight of the evidence establishes that the defendant maintained these below cost prices in a good faith response to competition. A showing of good faith in meeting competition is a defense to a California Unfair Practices Act charge. Cal.Bus. & Prof. Code, § 17050(d). The overwhelming weight of the evidence shows that Continental dropped its prices in response to competitive activity in the industry. Inglis argues that area wide price decreases in response to competitive offers and the offering of private label prices to new as well as old prices evidenced bad faith. As a matter of law, blanket price cuts and offers to new customers are not illegal. *See, Cadigan v. Texaco, Inc.,* 492 F.2d 383 (9th Cir. 1974); *Balian Ice Cream Co. v. Arden Farms Co.,* 231 F.2d 356 (9th Cir. 1955), *cert. denied,* 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 (1956).

Inglis also contends that bad faith was shown by the failure to document competitive offers for private label bread in contrast to the treatment given Wonder bread and by the failure to increase private label prices in 1973. These two factors do not render the meeting competition defense invalid. Evidence at trial emphasized the highly competitive nature of the Northern California market. In all cases, Continental responded to some activity of lower price offers by its competitors. Although this court recognizes that the question of good faith is appropriately left for the jury, it cannot let stand what it views as a totally erroneous result. Therefore, a new trial is mandated on the state claim.

## DAMAGES

 The $5,048,000 judgment returned against defendant Continental Bak-

ing Company is against the weight of the evidence and warrants the award of a new trial. In an antitrust case, the plaintiff need not prove the amount of damage to an absolute certainty. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Flintkote Co. v. Lysfjord,* 246 F.2d 368 (9th Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). As long as the plaintiff has established the reasonable probability of some connection between the defendant's violation and some loss to the plaintiff, the jury is entitled to make a "just and reasonable estimate of the damage based on relevant data." *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. at 264, 66 S.Ct. at 580; *Flintkote Co. v. Lysfjord, supra,* 246 F.2d at 392. However, in this case, the plaintiff produced no competent evidence from which the jury could have arrived at a damage figure within reasonable approximation of the judgment returned. Absent any such competent evidence, the damage award could only have been based on speculation, guesswork or incompetent evidence.

The only evidence of damages submitted to the jury was that based on plaintiff's exhibits P–80I and P–80D. Exhibit P–80I presented the actual profit and loss history of the Inglis Company from 1960 through 1975. The damage claim presented to the jury through this exhibit, including operating losses, debts arising from losses and lost going concern value, totalled $2,985,093. Exhibit P–80D established claimed lost profits for the one pound private label and secondary label bread for 1971 and 1973 by calculating the difference between the selling price and the total cost for the number of units sold. The damage study assumed that bread would be sold at least for that total cost and on that assumption shows a projected loss of $564,938 in 1973 and $775,-596·in 1971.

During the trial, Inglis also attempted to prove damages premised on loss of profits through a "before and after" method which used the profit experience of the Inglis Company in 1960–64 as a base period. Testimony relating to this theory was presented to the jury through plaintiff's expert Mr. Kupperberg. However, following that testimony, this court ruled that this damage analysis and the accompanying testimony be stricken because the comparability of the base and later period had not been established. Use of this method would have resulted in a considerably higher damage estimate than that based on actual losses.

The approximately five million dollar verdict returned by the jury indicates that it must have relied on either this inadmissible "before and after" analysis in reaching its verdict [13] or on some other alternative profit calculation method not presented by the plaintiff. The one pound profit study contained in P–80D does not support the award. The assumption underlying that study that Inglis would have been able to sell the same number of units at the higher fixed cost price is not substantiated by the plaintiff and is probably incorrect given the highly competitive nature of the market. Nor can the profit calculations Inglis sets forth in its Brief in Opposition to the New Trial and JNOV motions based on the profit history of either Continental or Campbell-Taggart support the verdict. These were merely post-trial arguments and no evidence was presented to establish the comparability of the data to allow such a profit analysis to be made. Since there was insufficient evidence to support such a high award of damages, the verdict cannot stand and a new trial is required.

The excessive verdict mandates a new trial on yet another basis. The jury verdict

---

**13.** Two notes received from the jury during their deliberations indicate this to be the case. First, the jury requested a rereading of the testimony of Mr. Kupperberg—"in particular part relating to how he established damages." Second, the jury asked whether they might be interrogated as to their damage award in light of Jury Instruction # 89. Jury Instruction

# 89 stated that an award of damages could not be based on speculation or surmise as to their amount. This instruction further states that "there must be a sufficient basis in the record from which you are able to make a reasonably accurate and just estimate of their (the damages) amount."

indicates that virtually all of Inglis' losses were caused by Continental Baking Co. This result goes against the weight of the evidence. In its presentation of damage evidence, the plaintiff made no attempt to distinguish which damages were attributable to which defendant. Rather it operated on the theory that Continental is liable for all losses due to its persistent below cost sales. The weight of the evidence belies the validity of this theory. There was significant evidence introduced at trial showing other factors contributed to Inglis' losses. These additional factors included the growth of the captive bakeries, ingredient cost increases, government price controls, the activity of Campbell-Taggart[14] and American and poor Inglis management. In light of these other contributing causes, an award of damages attributing virtually all actual losses and some lost profits to Continental cannot stand absent more specific proof of Continental's direct causation.

CONCLUSION

Continental, a nationwide wholesale baker and a subsidiary of ITT, is without question a major competitor in the industry. Plaintiff Inglis, in contrast, was a much smaller and more localized operation. But "[b]igness, however is not a disqualification to compete." *Pacific Engineering & Production Co. v. Kerr-McGee Corporation, supra,* 551 F.2d at 799. The antitrust laws were not intended to be a subsidy for inefficiency, *Janich Bros., Inc. v. American Distilling Co., supra,* 570 F.2d at 856 n.7; *Hanson v. Shell Oil Co., supra,* 541 F.2d at 1359, nor to shelter the individual competitor from the competitive process. *International Air Indus., Inc. v. American Excelsior Co., supra,* 517 F.2d at 721.

The evidence presented at trial painted only a picture of a highly competitive market. In the absence of a showing of any predatory or otherwise illegal activity, the jury verdict cannot stand. Continental is entitled to a JNOV and, in the alternative, a new trial on the federal claims and a new trial on the state claim in accordance with the reasons stated herein.

---

14. The role of Campbell-Taggart is particularly bothersome. This company settled prior to trial with Inglis for approximately $3.5 million (see Footnote 1, *supra*). It was a very strong and active competitor in the Northern California market. While the fact of the settlement is inadmissible under Federal Rule of Evidence 408 to establish liability of Campbell-Taggart for the antitrust violations, the jury should have been made aware of the Inglis plant acquisition as part of that settlement and of Campbell-Taggart's current market position. Without these facts, the jury had before it a badly skewed picture of the market.